Richard A. GEIER, individually and on behalf of others similarly situated, Plaintiff,

v.

M-QUBE INC., et al., Defendants.

C13–354 TSZ

United States District Court, W.D. Washington, at Seattle.

Signed 01/20/2016

Jennifer Rust Murray, Toby James Marshall, Erika L. Nusser, Terrell Marshall Law Group PLLC, Seattle, WA, Matthew J. Zuchetto, Darrell Scott, Scott Law Group, Spokane, WA, for Plaintiff.

Alan D. Sege, Los Angeles, CA, Stephen M. Rummage, Candice Tewell, Colin G. Prince, James C. Grant, Max Bamberger Hensley, Davis Wright Tremaine, Angelo J. Calfo, Shane P. Cramer, Calfo Harrigan Leyh & Eakes, LLP, Seattle, WA, for Defendants.

## ORDER

Thomas S. Zilly, United States District Judge

THIS MATTER comes before the Court on plaintiff's motion for class certification, docket no. 82. Having reviewed all papers filed in support of, and in opposition to, plaintiff's motion, the Court enters the following order.

### Background

This case concerns the practice of "mobile cramming," which is the practice of "placing unauthorized, misleading, or deceptive charges on a consumer's telephone bill." *Fed. Trade Comm'n v. Inc21.com Corp.*, 745 F.Supp.2d 975, 996 (N.D.Cal.2010). At a high level, the cramming industry included three different groups: content providers, who created products which were sold to consumers; cell carriers, such as AT&T and Verizon who would bill their customers for purchasing content providers' products; and billing aggregators, which served as a link between the two. Though defendant Mobile Messenger [1] was a billing aggregator, it also occupied a hybrid position in the market by virtue of its creation of "white-label PSMS" programs, which were products it created but offered to content providers to directly market to consumers. These PSMS programs provided services such as ringtones, trivia, games, etc. to cell phone subscribers through a four to six digit number known as a "short code." Marshall Decl., docket no. 83–1, Ex. 4 (FTC Report on Mobile Cramming at 4). While much of the PSMS industry involved marketing such goods, it was (and still is) used for raising funds for charities and political campaigns. *Id.* at 2. One stated advantage of PSMS billing is that it allows businesses, charities, and political campaigns to bill customers or clients via their cell phone bill, rather than directly through a credit card. *Id.*

In the PSMS industry, aggregators like Mobile Messenger served as a link between

---

1. Defendant m-Qube Inc. is an affiliate of defendant Mobile Messenger which provided some technological support for Mobile Messenger's operations.

content creators and carriers. Aggregators would allow content providers to connect to the wireless carriers' networks to send and receive text messages through short codes which were assigned by the carriers. Machock Decl., docket no. 102, ¶ 5. In addition, these aggregators were able to instruct the carriers to place charges upon a customer's cell phone bill. Marshall Decl., docket no. 83-1, Ex. 4 (FTC Report on Mobile Cramming at 5). Aggregators such as Mobile Messenger would receive a proportion of those bills, typically the smallest share. Machock Decl., docket no. 102, ¶ 5.

A typical sequence of events leading to a charge on a customer's cell bill begins with a customer viewing a website known as a "landing page." The landing page would market some product or service, and instruct the user to input his or her cell phone number into the page. After doing so, a text message from a short code would be sent to the cell phone number and contain a PIN number. Bonato Decl., docket no. 108, ¶¶ 2–3. Only after the customer entered that PIN number into the landing page would charges be placed upon the customer's cell phone bill. *Id.* These two steps were known as the "double opt-in process," which was designed to ensure that the owner of a certain cell number was the individual enrolling for a program. For its white-label PSMS programs, Mobile Messenger provided sample landing pages and marketing materials to its partners, but had no direct control over what the ultimate landing pages looked like. Machock Decl., docket no. 102, ¶ 7.

The PSMS industry was ultimately revealed to be rife with abuse and fraud, leading government regulators to bring multiple enforcement actions that resulted in each major carrier agreeing to a cessation of the business and the creation of refund pools. *Id.* ¶ 15–16; Tewell Decl., docket no. 189, Ex. D (CFPB Settlement Agreement at 16). During the existence of the for-profit PSMS industry, carriers would routinely refund charges that customers disputed. When they did so, the carriers would deduct such

funds from monies owed to whichever aggregator was responsible for billing the client. Machock Decl., docket no. 102, ¶ 16.

This suit arose after the named plaintiff, Richard Geier, learned that he had been billed[2] by Pow! Mobile for one of Mobile Messenger's white-label products. Cacciato Decl., docket no. 17, ¶ 10. A declaration from the CEO of Pow! Mobile details the process through which plaintiff's wife, Ms. Geier, subscribed to one of Mobile Messenger's white-label products. Pow! Mobile's records demonstrate that Ms. Geier signed up for the product by going through the standard authentication procedure. *Id.* ¶¶ 15–28.[3] Ms. Geier has little to no memory of this process. Prince Decl., docket no. 117, Ex. 5 (M. Geier Tr. 31:11–22; 50:24–51:24). Although AT & T provided plaintiff with refund credit in excess of the unwanted PSMS charges, Prince Decl., docket no. 117, Ex. 1 (Geier Tr. 47:24–48:4), he ultimately brought suit against defendants.

Plaintiff disputes that his wife ever signed up for a PSMS product from defendants. At her deposition, Ms. Geier testified that she never entered a PIN number on a webpage that she received on her phone, and if she *had* entered a phone number into a landing page, it would have been her home line. Prince Decl., docket no. 117, Ex. 5 (M. Geier Tr. 31:11–22). In briefing, plaintiff speculates, without support, that they were enrolled through "stacked marketing," but admit that they "have no understanding as to how they were enrolled." Pl.'s Mot., docket no. 81, at 31.

Plaintiff now moves, pursuant to Rule 23(b)(2) and Rule 23(b)(3) to certify the following class: "All residents of Washington who, at any time from October 17, 2008 to the present, were enrolled through a website for one of Mobile Messenger's white-label PSMS programs." Pl.'s Mot., docket no. 81, at 1.

---

**2.** The billing was via his wife's cell phone which was part of their combined plan.

**3.** Plaintiff denies Pow! Mobile's sequence of events, claiming, through counsel, that a forensic

evaluation of his computer demonstrates that neither he nor his wife ever visited the relevant sites. Marshall Decl., docket no. 83, ¶ 10.

## Discussion

### A. Standard for Class Certification

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, — U.S. —, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Certification of a class is within the discretion of the Court, guided by Rule 23. That rule "does not set forth a mere pleading standard," but instead embodies evidentiary thresholds that plaintiff must satisfy. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). Rule 23(a) requires a plaintiff to affirmatively demonstrate that the proposed class is sufficiently numerous, that it presents commons questions of law or fact, that the class representatives bring claims typical of the class, and that the class representatives will adequately represent the class. If a plaintiff establishes each element of Rule 23(a), he or she must also satisfy one subsection of Rule 23(b). This analysis is "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal–Mart Stores*, 131 S.Ct. at 2552 n. 6.

Defendants challenge almost every element of the Rule 23 inquiry, ceding only numerosity.

### B. Rule 23(a)

#### 1. Commonality

To satisfy Rule 23(a)(2), plaintiff must establish that there are "questions of law or fact common to the class." It requires that "the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir.2013). However, the issue is not whether there are "common questions," but whether approving a class will "generate common answers apt to drive the resolution of the litigation." *Wal–Mart Stores*, 131 S.Ct. at 2551 (quoting Rich-

ard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.Rev. 97, 132 (2009)). Courts determine commonality with reference to the nature of the underlying claims. *See Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir.2014) (citing *Amgen Inc.*, 133 S.Ct. at 1194–95).

Plaintiff alleges three causes of action against defendants: (i) violation of the Washington Consumer Protection Act, RCW 19.86.020 *et seq.*, (the "CPA"); (ii) conversion; and (iii) unjust enrichment.[4] To establish a claim under the CPA, a plaintiff must prove an "(1) unfair or deceptive practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Klem v. Wash. Mut. Bank*, 176 Wash.2d 771, 783, 295 P.3d 1179 (2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 780, 719 P.2d 531 (1986)). Plaintiff argues that whether defendants engaged in an unfair or deceptive practice is a common question that will "generate common answers apt to drive the resolution of the litigation." *See Wal–Mart Stores*, 131 S.Ct. at 2551.

The core dispute with respect to commonality is precisely what plaintiff must prove is an "unfair or deceptive practice." Plaintiff has identified six practices which he argues each will have a common answer as to the deception element of a CPA claim. Specifically, he argues that defendants "(1) engaged in a common practice of enrolling consumers through unfair and deceptive landing pages; (2) engaged in a common practice of creating, controlling, and sending unfair and deceptive text messages to consumers during the enrollment process; (3) engaged in a common practice of unfairly and deceptively manipulating refund rates so that the company could continue enrolling consumers; (4) engaged in a common practice of unfairly and deceptively circumventing short code suspensions and terminations so that the company could continue enrolling consumers; (5) engaged in a common practice of employing unfair and

---

4. Despite alleging three causes of action, plaintiff in his briefing and at argument focused on Rule 23's requirements with reference almost entirely to the CPA claim. The Court notes that reliance on establishing Rule 23's requirements with reference to the other two claims would likely run afoul of the commonality requirement, given the individualized showings inherent in those claims.

deceptive billing descriptors; and (6) unfairly and deceptively use[ ] the 'double opt-in' process as a shield against consumer complaints." Pl.'s Mot., docket no. 81, at 36. In contrast, defendants argue that these practices merely represent various ways they may have violated the same statute, i.e. the CPA, but not that they allegedly violated it in the same way as to all putative class members.

■ The key flaw with plaintiff's position is describing these practices as "common," in this context meaning universal to the class, when in truth they are "frequent." Because the specific interaction between class members and defendants varied widely, any possible question with a common answer necessarily has to be abstract in nature. A question resulting in a common answer could not, for example, be whether a specific landing page is "unfair or deceptive" for purposes of the CPA. There is no argument that the landing pages were identical, and further, the landing pages were not even under the control of defendants.[5] Machock Decl., docket no. 102, ¶¶ 7, 8, 11. Because the content of the landing pages varied, the only common element to all class members is that they enrolled through landing pages. Whether "enrolling consumers through unfair and deceptive landing pages" is an "unfair and deceptive practice" is not a question that will "generate common answers apt to drive the resolution of the litigation." *Wal–Mart Stores,* 131 S.Ct. at 2551. It is a question so circular as to be pointless. Asking it immediately begs the follow-up question of "What did the landing page say?" In essence, framing the common question this way merely punts on the analysis until the causation stage. Further, the question relies on a false premise: namely, that all class members viewed "unfair and deceptive landing pages." While some, perhaps even most, of the landing pages used to enroll class members in defendants' programs may have been deceptive, industry data strongly suggests that some appreciable quantity of them were fully compliant with industry standards. *See* Marshall Decl., docket no. 83–1, Ex. 17 (CTIA Report at 214). Given plaintiff's incredibly broad pro-

posed class, these same issues plague the other five enumerated practices.

To permit a class to prove defendants' conduct was unfair or deceptive by reference to specific interactions they did not all experience would in essence allow class members to pick and choose from a cornucopia of thousands of commercial relationships to construct the best possible claim, rather than rely on their own claims. The purpose of the class action vehicle is not to allow class members to bootstrap their own individual claims by pointing to the experiences of other class members. If a plaintiff cannot rely on someone else's experience to prove his or her claim in an individual action, he or she cannot do so in the class context.

Two additional elements of a CPA claim are whether defendants' conduct is within trade or commerce and whether it has a public interest impact. *Klem,* 176 Wash.2d at 783, 295 P.3d 1179. Neither element is seriously challenged. The Ninth Circuit's holdings on commonality require "a single *significant* question of law or fact," *Abdullah,* 731 F.3d at 957 (quoting *Mazza v. Am. Honda Motor Co.,* 666 F.3d 581, 588 (9th Cir.2012)) (emphasis added). These issues are *not* significant questions of law, nor "apt to drive the resolution of the litigation." *Wal–Mart Stores,* 131 S.Ct. at 2551. Accordingly, the Court does not find that Rule 23(a)(2)'s commonality requirement has been met.

### 2. Typicality

■ Under Rule 23(a)(3), the claims or defenses of the class representatives must be typical of the claims or defenses of the class. While the typicality requirement is a "permissive standard," *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998), it still requires that "the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 510 (9th Cir.1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class

---

**5.** The Court notes that any theory based on improperly allowing the individual marketers to create the landing pages is foreclosed by the facts

in *Wal–Mart Stores.* 131 S.Ct. at 2554 (rejecting a class based on a policy of "allowing discretion by local supervisors over employment matters").

members have been injured by the same course of conduct." *Id.* at 508 (internal quotations omitted). Defendants argue that plaintiff is atypical because (i) he already received a refund for the billing; (ii) his wife claims to have enrolled in a different manner than the class; and (iii) his wife enrolled in a different product than many class members.

It is undisputed that plaintiff received credits from AT, his carrier, after he complained both to AT and the Washington Attorney General. *See* Prince Decl., docket no. 117, Ex. 1 (Geier Tr. 47:24-48:4); Ex. 14 (AT Bill at 1). While the parties dispute whether these credits were traceable to defendants' charges, plaintiff would not be atypical even if they were. The thrust of defendants' argument is that a refund would constitute a defense that would defeat plaintiff's CPA claim. However, the CPA requires only an injury, not damages. *Klem*, 176 Wash.2d at 783, 295 P.3d 1179. The Washington Court of Appeals has previously found the temporary deprivation of funds to be a sufficient injury to support a CPA claim. *See Sorrel v. Eagle Healthcare, Inc.*, 110 Wash. App. 290, 298, 38 P.3d 1024 (2002) ("Sufficient injury ... is established when a plaintiff is deprived of the use of his property as a result of an unfair or deceptive act or practice."). In *Sorrel*, plaintiff "was denied rightful possession of his funds for a period of two weeks," which the court considered an "injury" for purposes of the CPA. While the fact that plaintiff has received recompense from AT & T may impact his ultimate damages award, the specter of individualized damage calculations is not a sufficient reason to find a class representative atypical. *See, e.g., McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 611 (S.D.Cal.2007) (noting that "individualized calculations of damages do not defeat typicality"). Because any issue of refund would not impact the viability of plaintiff's claim, there is no "danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508.

Defendants next argue that because Ms. Geier denied ever entering her cell phone number into a webpage that plaintiff's claim is distinct from the class. Defs.' Resp., docket no. 116, at 26. It is true that at her deposition Ms. Geier denied ever entering a pin number she received via text message or otherwise complying with the double opt-in process, and expressed confusion as to how she could have been billed. Prince Decl., docket no. 117, Ex. 5 (M. Geier Tr. 31:11-22). However, defendants have long contended that the *sole* method of enrolling in one of their products is through the double opt-in process. Indeed, Ms. Geier also testified at that same deposition that she did enter her cell phone number into a website for an IQ test. Suppl. Marshall Decl., docket no. 128, Ex. 151 (M. Geier Tr. 19:23-21:6; 26:1-13). In addition, at an earlier stage of this litigation defendants offered a declaration purporting to detail the exact process by which Ms. Geier enrolled in their program, mirroring the typical claim of class members. *See* Cacciato Decl., docket no. 17, ¶¶ 15-28. That Ms. Geier was unable to recall the precise mechanism by which she enrolled in defendants' program does not render her claim atypical.

Defendants also argue that Ms. Geier purchased a specific product, i.e. "mobilebidnwin," whereas other putative class members subscribed to distinct products from a litany of different content providers. *See generally* Cacciato Decl., docket no. 17, ¶¶ 15-28 (tracing Ms. Geier's enrollment). While in some circumstances the nature of the precise product is dispositive for typicality, *see, e.g., Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 666 (C.D.Cal.2009), plaintiff's theory does not turn on the nature of the products actually sold. Rather, plaintiff alleges that defendants sold products in a deceptive manner, not that the various products have distinctive features which impact their legal theory. Ultimately plaintiff's interests align with absent class members' and thus he meets the typicality requirement.

### 3. Adequacy

Defendants next challenge plaintiff's adequacy as a class representative. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The analysis is composed of two separate inquiries: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members

and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir.2011) (internal quotations omitted).

 Relying on *Ellis*, defendants argue that plaintiff lacks a shared interest with absent class members. Defendants' core contention is that because plaintiff testified at his deposition that he was not "looking for a further refund," Prince Decl., docket no. 117, Ex. 1 (Geier Tr. 32:1–23), he lacks a shared interest with class members who are seeking monetary relief. *Ellis* involved a class of Costco employees who sued seeking an injunction against the company's discriminatory promotion policies. The Ninth Circuit found two class representatives inadequate for a class seeking that relief where those representatives were no longer employees of Costco, and thus ineligible for injunctive relief. 657 F.3d at 986. Thus, defendants contend that because plaintiff is no longer seeking monetary relief he is an inadequate representative for the class.

Defendants' argument mischaracterizes plaintiff's position with respect to future recovery. In a declaration subsequent to his deposition, plaintiff clarified that he was not "pursuing this case based on some motivation for personal gain," but that he was not relinquishing his right to recover under the CPA. Geier Decl., docket no. 129, ¶¶ 4–6; *see also* Sec. Am. Compl., docket no. 145, at 18 (demanding damages for CPA violation). Further, the key point for the *Ellis* court was that the class representatives did "not have standing to seek injunctive relief." *Ellis*, 657 F.3d at 986. In contrast, there is no argument that plaintiff lacks standing to bring a CPA claim, and the Court finds that he is an adequate class representative.[6]

### C. Rule 23(b)(2)

 Plaintiff asks the Court to certify a class under Rule 23(b)(2) to seek injunctive relief declaring defendants' business prac-

tices to be unfair and deceptive and to enjoin them. Rule 23(b)(2) contemplates class treatment where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Pr. 23(b)(2). A Rule 23(b)(2) class is only warranted "when a single injunction or declaratory judgment would provide relief to each of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal–Mart Stores*, 131 S.Ct. at 2557 (emphasis in original).

 Defendants contend that injunctive relief is inappropriate because they have exited the PSMS industry, destroying any future risk of harm. Because the purpose of injunctive relief is to prevent future harm, "Rule 23(b)(2) certification is ... inappropriate when the majority of the class does not face future harm." *Maldonado v. Ochsner Clinic Foundation*, 493 F.3d 521, 524 (5th Cir.2007); *see also Sullivan v. DB Invests., Inc.*, 613 F.3d 134, 156 (3d Cir.2010) ("The plaintiffs must demonstrate that, regardless of their past harm, they are likely to suffer harm in the future."), overruled on other grounds by 667 F.3d 273 (3d Cir.2011) (en banc). The Court is satisfied that there is no likelihood of future harm.

 It is undisputed that defendants no longer operate in the PSMS industry. There is additionally no risk of them beginning again, as no cell carrier allows for-profit PSMS billing. *See* Machock Decl., docket no. 102, ¶ 17.[7] Any risk of future harm is predicated upon "an extended chain of highly speculative contingencies," which cannot serve to establish a Rule 23(b)(2) class. *Davis v. Homecomings Fin.*, 2007 WL 1600809, *2 (W.D.Wash. June 1, 2007) (quoting *Nelsen v. King Cnty.*, 895 F.2d 1248, 1252

---

**6.** Defendants also argue that plaintiff's conduct in other suits involving similar claims demonstrates he will not act in the class's interest. Specifically, they argue that because plaintiff settled a suit in King County with a different PSMS aggregator and kept the proceeds, that he is inadequate. *See generally* Prince Decl., docket

no. 114, Ex. 16 (Motricity Settlement). The Court rejects this argument and finds plaintiff to be an adequate representative.

**7.** Although commercial interests no longer operate in the PSMS realm, carriers still allow charitable groups and political campaigns to do so.

(9th Cir.1990)). Plaintiff contends that defendants have planned to begin operating in a similar, but distinct, form of cell phone billing known as "direct carrier billing." *See* Suppl. Marshall Decl., docket no. 128, Ex. 153 (FTC Mobile Cramming Roundtable at 39). While they bear some similarities, they are distinct and there is no evidence in the record that the putative class is at any risk of harm from this prospective business. Plaintiff also argues that defendants continue to invoke the double opt-in process as a shield against suits is a continuing harm they face. However, it is difficult for the Court to imagine how its use, which is recommended by the industry group that oversaw the PSMS industry, is per se a violation of the CPA. Any injunction would therefore have to be on a case-by-case basis, which is clearly impermissible under Rule 23(b)(2). *See, e.g., Jefferson v. Ingersoll Intern., Inc.*, 195 F.3d 894, 897–98 (7th Cir.1999) ("Rule 23(b)(2) is designed for all-or-none cases.").[8]

Because there is no likelihood of future harm, the Court finds that certification under Rule 23(b)(2) is not warranted.

### D. Rule 23(b)(3)

For the Court to certify a class under Rule 23(b)(3), plaintiff must establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). This requirement ensures that "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir.2013) (quoting *Hanlon*, 150 F.3d at 1022). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). The Court is convinced that individual issues would predominate over class-wide

ones and therefore will not certify a class under Rule 23(b)(3).

The core issue which dooms plaintiff's proposed class is the CPA's causation requirement. *See Klem*, 176 Wash.2d at 783, 295 P.3d 1179. For purposes of the CPA, causation must be proximate, which is defined as a "cause which in direct sequence [unbroken by any new independent cause] produces the injury complained of and without which such injury would not have happened." *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash.2d 59, 81–82, 170 P.3d 10 (2007) (quoting WPI 310.07) (alterations in original). Put another way, defendants' conduct must be the "but for" cause of the harm. *See id.* at 82, 170 P.3d 10.

As a result of the overwhelmingly broad class, questions of causation will predominate. "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members." *Sullivan v. DB Invests., Inc.*, 667 F.3d 273, 298 (3d Cir.2011) (en banc). The conduct relevant to the causation analysis is not "common as to all of the class members," and thus there is no method for plaintiff to establish causation on a classwide-basis. While there may be a presumption of reliance in omission-based CPA claims, claims based in part on affirmative misrepresentations receive no such presumption. *Weidenhamer v. Expedia, Inc.*, 2015 WL 7157282, *13 (W.D.Wash. Nov. 13, 2015); *see also Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir.1999) (holding the same in securities fraud context). Plaintiff's briefing makes clear that his claim relies, in part, on affirmative misrepresentations. *See* Pl.'s Mot., docket no. 81, at 36 (reciting that defendants "engaged in a common practice of enrolling consumers through unfair and deceptive landing pages").[9]

Courts frequently deny certification to classes which will involve individualized cau-

---

**8.** Plaintiff also argues that the Washington Supreme Court's decision in *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wash.2d 298, 312, 553 P.2d 423 (1976) stands for the proposition that injunctive relief could be warranted here. Yet, even the *Ralph Williams* court conceded that an injunction would be inappropriate if "events make it absolutely clear the

allegedly wrongful behavior could not reasonably be expected to recur." *Id.*

**9.** Plaintiff elsewhere argues that his claims in no way rely on affirmative misrepresentations, but he has included in the record numerous exhibits which contain affirmative misrepresentations.

sation findings. *See, e.g., Weidenhamer,* 2015 WL 7157282 at \*13; *Estate of Felts v. Genworth Life Ins. Co.,* 250 F.R.D. 512, 525–26 (W.D.Wash.2008); *Kelley v. Microsoft Corp.,* 251 F.R.D. 544, 558 (W.D.Wash.2008). The result must be the same in this case. The proposed class definition includes, among others, class members who viewed non-misleading landing pages, received precisely what they bargained for, at a price they were clearly informed of. Each class member's claim will depend upon proving causation, which will necessarily rely on facts individual to each class member.

■ The Court also observes that individual issues with respect to damages will predominate. Although "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)," they are still relevant to the calculus. *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir.2013). Each class member purchased a different product for a different period of time, contrasted to a hypothetical case where all plaintiffs purchased a single uniformly priced item. Accordingly, the Court finds that individual issues would predominate and will not certify a class under Rule 23(b)(3).[10]

### Conclusion

For the foregoing reasons, the Court concludes that there is no significant, common question of law or fact, there is no risk of future harm to permit injunctive relief, individual questions will predominate, and that a class action is not a superior vehicle of resolution in light of the cell phone carriers' settlements. Thus, plaintiff's motion for class certification, docket no. 82, is DENIED without prejudice. Plaintiff shall file any renewed motion for class certification within twenty-eight days of this order.

IT IS SO ORDERED.

---

10. The Court also expresses its belief that a class action litigation is not the superior method of resolving this controversy. Each major cell carrier has settled with a federal agency over their participation in the PSMS industry, agreeing to cease all involvement, to make available millions of dollars to refund customers, and to provide notice of the same. *See, e.g.,* Tewell Decl., docket no. 189, Ex. D (CFPB Consent Decree). While the collateral source doctrine would prevent defendants from benefiting from payments made by an independent source, *see, e.g., Cox v. Spangler,* 141 Wash.2d 431, 440, 5 P.3d 1265 (2000), the carriers occupy a position more of a co-tortfeasor rather than an insurer. While the PSMS industry operated, carriers received 35% of each PSMS charge, whereas defendants received only 10%. Machock Decl., docket no. 102, ¶ 5. Applying the collateral source doctrine would result in class members being able to make a triple recovery by suing their carriers, defendants, and the content providers over a pool of money which was split between the three. Because class members could receive compensation directly from the carriers, it would be wasteful of judicial resources to litigate a class action over the same issues. *See In re Phenylpropopanolamine (PPA) Prods. Liab. Litig.,* 214 F.R.D. 614, 621–23 (W.D.Wash.2003) ("It makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress.").