Olivia MENDOZA, et al., Plaintiffs,

v.

ZIRKLE FRUIT CO., et al., Defendants.

No. CY–00–3024–FVS.

United States District Court,
E.D. Washington.

July 13, 2004.

Steve W. Berman, Andrew M. Volk, Hagens Berman LLP, Seattle, WA, Michael V. Connell, Smart Law Offices PS, Yakima, WA, Howard W. Foster, Johnson & Bell Ltd., Chicago, IL, for Plaintiffs.

Walter G. Meyer, Jr., Mark David Watson, Meyer, Fluegge & Tenney, Ryan M. Edgley, Paul Hamilton Beattie, Edgley & Beattie PS, Lawrence Edwin Martin, Terrence Colin Schmalz, Halverson & Applegate PS, Brendan Victor Monahan, Velikanje, Moore & Shore PS, Yakima, WA, Alexander A. Baehr, Holland & Knight LLP, James Alexander Smith, Jr., Smith & Hennessey PLLC, Marvin Lee Gray, Jr., Hall Baetz, D. Bruce Lam-

ka, Darya V. Swingle, Davis Wright Tremaine, Seattle, WA, for Defendants.

## ORDER

VAN SICKLE, Chief Judge.

**THIS MATTER** comes before the Court based upon the plaintiffs' motion for class certification. For the reasons set forth below, the motion is granted in part and denied. in part.

### BACKGROUND

For many companies located in the central part of the State of Washington, the need for workers varies dramatically from season to season. Selective Employment Agency, Inc., is in the business of satisfying the need for seasonal workers. As part of this business, Selective solicits and screens job applicants. If hired, applicants become Selective's employees. Selective then sends them to a client who needs short-term workers. While Selective's employees work at the client's place of business, they remain employees of Selective.

Zirkle Fruit Company was one of Selective's clients. Zirkle paid Selective to provide persons to work in its warehouse. The persons whom Selective sent to Zirkle's warehouse performed a variety of tasks. The tasks they performed included sorting, bagging, packing, and shipping of fruit.

Plaintiffs Olivia Mendoza and Juana Mendiola were among the persons hired by Selective and sent to work at Zirkle's warehouse. They worked there, as employees of Selective, from September of 1999 until February of 2000. They were not the only persons hired by Selective and assigned to work at Zirkle's warehouse. As of November of 1999, there were approximately 300 others. This number declined rapidly. By September of 2000, fewer than 20 of Selective's employees were working in Zirkle's warehouse. By January of 2001, there were just three. The last one left Zirkle's warehouse on May 28, 2001. The preceding statistics illustrate an important point. Selective did not fill all of Zirkle's labor needs. To the contrary, most of the persons who worked in Zirkle's warehouse were hired directly by Zirkle.

Although Selective provides workers for many types of jobs, Selective does not provide orchard workers. Businesses such as Zirkle Fruit Company and Matson Fruit Company hire their own orchard workers.

Zirkle operates orchards in a number of distinct geographic regions of central Washington. According to Zirkle, the manager of each orchard either hires the workers he needs or delegates this responsibility to his subordinates. One of Zirkle's orchards is located in a region that is referred to as "the Royal Slope." As of November of 1999, plaintiff Victor Sanchez was working in Zirkle's "Royal Slope" orchard. He continued working in this orchard until November of 2000, when he quit. Early in 2001, he moved to California.

The plaintiffs allege William Zirkle (chief executive officer), William Wangler (chief financial officer), and Gary Hudson (human resources manager) conspired to employ persons who are not authorized to work in the United States in an effort to limit the wages Zirkle Fruit Company must pay to those of its employees who are authorized to work in the United States. As part of this effort, Mr. Hudson allegedly arranged for Selective Employment Agency, Inc., to hire illegal aliens to work in Zirkle's packinghouse (*i.e.*, warehouse).

Like Zirkle, Matson Fruit Company operates both orchards and a warehouse in central Washington. Of the three plaintiffs, only Ms. Mendoza was employed by Matson. She worked in Matson's warehouse as a fruit-packer from about September 12, 2000, until about September 30, 2000. The plaintiffs allege Roderick Matson (chief executive officer) and Darryl Matson (human resources manager) conspired to employ persons who are not authorized to work in the United States in an effort to limit the wages Matson Fruit Company must pay to those of its employees who are authorized to work in the United States.

The plaintiffs have filed an action seeking relief from a number of defendants under both the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the common law of the

State of Washington. They move the Court to certify a class consisting of

all person legally authorized to work in the United States who have been employed by Matson Fruit Co. and/or Zirkle Fruit Co., either directly or through Defendant Selective Employment Agency ("Selective"), for employment in their packinghouses as hourly wage earners or in their fruit orchards as either hourly wage, or piece-rate, workers from November 5, 1999, to the present.

(Plaintiffs' Motion for Class Certification at 1–2.)

## IDENTIFYING CLASS MEMBERS

■ Implicit in Federal Rule of Civil Procedure 23 is the requirement that a class exists. *Equal Employment Opportunity Comm'n v. General Telephone Co.,* 599 F.2d 322, 327 (9th Cir.1979) (citing 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, §§ 1760, 1761 (1972)). Zirkle claims the plaintiffs cannot satisfy this requirement because they lack a reliable means to determine which employees were authorized to work in the United States and which were not. Zirkle says the method proposed by the plaintiffs for determining a worker's status—*i.e.,* by asking the government to check either his I–9 form or his social security card—is unreliable. According to Zirkle, both the Bureau of Immigration and Customs Enforcement and the Social Security Administration have taken the position that the presence or absence of a match is inconclusive. Without a reliable means to distinguish between authorized and unauthorized workers, says Zirkle, it is impossible to notify potential members of the class.

The plaintiffs disagree. Insofar as the identification of class members is concerned, they say Zirkle's position is undercut by its business practices. According to the plaintiffs, Zirkle routinely terminates employees whose documentation does not match the information held by a government agency. If, say the plaintiffs, the absence of a match is sufficiently reliable to make important employment decisions, it is sufficiently reliable to identify class members. Insofar as notice is concerned, the plaintiffs recognize that a class which is proposed under Rule 23(b)(3)—as this one is—must be sufficiently well defined so that the Court may provide "individual notice to all members who can be identified through reasonable effort." Fed. R.Civ.P. 23(c)(2). Here, say the plaintiffs, adequate notice of the proposed class can be provided to potential members by mailing letters in Spanish and English to the last known address of each of the defendants' employees and by posting notice in the defendants' workplaces.

Neither of Zirkle's objections precludes certification. A class does not have to be defined with precision at the outset. 7A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1760, at 117 (2d ed.1986). According to Professor Wright and his colleagues, the test is whether the description of the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* at 121. Here, a class of authorized workers clearly exists. Determining the identity of its members and providing them with adequate notice will not be easy. However, the plaintiffs have provided an adequate plan for accomplishing these tasks.

## RULE 23

The plaintiffs bear the burden of persuasion. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). Initially, they must satisfy the requirements imposed by Rule 23(a). In order to do so, they must demonstrate that (1) the class is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation"). *See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 953 (9th Cir.2003). The second, third, and fourth requirements tend to merge together. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 2251 n. 20, 138 L.Ed.2d 689 (1997) (hereinafter *"Amchem"*). Taken together, these three requirements " 'serve as guideposts for determining wheth-

er ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id.* (quoting *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)). If the plaintiffs satisfy the four initial prerequisites imposed by Rule 23(a), the focus shifts to Rule 23(b). In this instance, the plaintiffs seek to maintain a class action under subsection (b)(3). A class action may be maintained under Rule 23(b)(3) if questions of law and fact common to the members of the class predominate over any questions affecting only individual members ("predominance"), and the class-action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy ("superiority"). *See Amchem Prods.,* 521 U.S. at 615, 117 S.Ct. at 2246. Rule 23(b)(3) contains a nonexhaustive list of factors that profitably may be considered in determining whether the plaintiffs have demonstrated predominance and superiority:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Amchem,* 521 U.S. at 615–16, 117 S.Ct. at 2246 (quoting Fed.R.Civ.P. 23(b)(3)).

## PLAINTIFFS' PROPOSED CLASS

The class suggested by the plaintiffs cannot be certified under Rule 23. To begin with, it combines the alleged victims of conspiracies that have little in common. Fed.R.Civ.P. 23(a)(2). As noted above, one conspiracy allegedly involved William Zirkle, William Wangler, and Gary Hudson. A second conspiracy allegedly involved Zirkle Fruit Company and Selective Employment Agency. A third conspiracy allegedly involved Roderick Matson and Daryl Matson.

Arguably, the first two conspiracies present common questions of law and fact. For example, did William Zirkle, William Wangler, and Gary Hudson conspire with each other and with Selective Employment Agency to hire persons who were not authorized to work in the United States? However, the first and second conspiracies have no meaningful connection with the third. The most one cay say is that the first and second conspiracies occurred during the same period of time as the third conspiracy; that the conspirators had a broadly similar objective (*i.e.,* to depress wages); and that the conspiracies existed in roughly the same geographical area. This is not enough to satisfy the requirement of commonality given the absence of an allegation (much less evidence) that the Matsons conspired with either the Zirkle defendants or Selective Employment Agency.

Another obstacle to certification is that, insofar as Matson Fruit Company is concerned, the named plaintiffs do not satisfy the requirement of typicality. Fed.R.Civ.P. 23(a)(3). Neither Juana Mendiola nor Victor Sanchez worked for Matson. Only Olivia Mendoza worked for Matson, and her employment was limited to an eighteen-day stint in its warehouse. She never worked in any of its orchards. In view of the plaintiffs' minimal contact with Matson, they are not in a position to represent the interests of Matson's workforce. *See, e.g., Staton,* 327 F.3d at 957; *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998). Recognizing as much, the plaintiffs have submitted affidavits from Bertha Aguirre and Augustin Aguirre. Although both claim to have worked for Matson Fruit Company during the class period, neither is a party to this action.

A third problem is predominance. Even if the original class satisfies the requirements imposed by Rule 23(a), the plaintiffs still must demonstrate that questions of law and fact common to the members of the proposed class predominate over questions affecting only individual members. Fed.R.Civ.P. 23(b)(3). Perhaps this can be said of the group(s) of workers allegedly victimized by the first two conspiracies. Perhaps, too, this can be said of the separate group of workers

allegedly victimized by the third conspiracy. However, the single class formed by the combination of these groups is insufficiently cohesive to warrant adjudication by representation. *Cf. Amchem*, 521 U.S. at 622–24, 117 S.Ct. at 2249–50 (discussing predominance).

Given the preceding considerations, the Court asked the parties to submit supplemental memoranda concerning two issues. The first is whether the defendants object to adding the Aguirres as plaintiffs. The second is whether the parties object to dividing the single class proposed by the plaintiffs into three subclasses: Subclass (A) would consist of persons who worked in Zirkle Fruit Company's warehouse from November 5, 1999, to the present whether Zirkle hired them directly or obtained them indirectly through Selective Employment Agency. Subclass (B) would consist of persons who worked in Zirkle Fruit Company's orchards from November 5, 1999, to the present. Subclass (C) would consist of persons who worked in Matson Fruit Company's orchards from November 5, 1999, to the present. The parties have submitted supplemental memoranda concerning both issues.

### REQUEST TO ADD NEW PARTIES

■ It is necessary to review some of the history of this case in order to determine whether the Aguirres should be added as new plaintiffs. A scheduling order was entered on December 10, 2002. On June 3, 2003, the plaintiffs moved to amend their complaint. The defendants argued the plaintiffs' request was untimely. This argument had considerable force. Nevertheless, after weighing the competing considerations, the Court found good cause for granting relief under Rule 16(b). As a result, the Court vacated a number of deadlines in the 2002 scheduling order and directed the parties to submit a new scheduling certificate. The plaintiffs said "they might need to add additional individuals involved with hiring at Zirkle Fruit Company and Matson Fruit Company after discovery has progressed, and believe it is appropriate to add new individual defendants after the class certification process is complete[.]" (Joint Scheduling Certificate of November 12, 2003, at 3.) However, the plaintiffs did not mention a need to add more plaintiffs. On December 2, 2003, a new Scheduling Conference Order was entered. It stated, in part, that the deadline for amending pleadings had expired. (Scheduling Conference Order of December 2, 2003, at 1.) Thus, the Aguirres can be added as plaintiffs only if good cause exists for the amendment. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992). In that regard, the record reflects that the discovery process had been underway for over 10 months when the current scheduling order was discussed and entered. At the time, the plaintiffs did not mention the need to add new plaintiffs. By the time the plaintiffs submitted affidavits from the Aguirres, the discovery process had been underway for over 15 months. The plaintiffs have made no effort to justify the delay. Given these circumstances, the plaintiffs have failed to establish good cause to modify the scheduling order of December 2, 2003. The Aguirres will not be added as plaintiffs.

### SUBCLASS (A)

Proposed Subclass (A) consists of persons who worked in Zirkle Fruit Company's warehouse from November 5, 1999, to the present whether Zirkle hired them directly or obtained them indirectly through Selective Employment Agency.

#### A. Rule 23(a)

##### 1. Numerosity

The plaintiffs must demonstrate "the class is so numerous that joinder of all members is impracticable[.]" Fed.R.Civ.P. 23(a)(1). This requirement is not disputed.

##### 2. Commonality

■ The plaintiffs allege the defendants knowingly hired illegal workers because illegal workers are less willing to assert their employment-related rights. As Selective points out, both legal and illegal workers are protected equally against employment discrimination. According to Selective, the crucial economic distinction in the agricultural marketplace is between long-term and short-term employees. In Selective's opinion, the

latter are much more vulnerable economically than the former. This is because short-term employees, unlike long-term employees, rarely qualify to vote in union elections. Most of the persons whom Selective hires and furnishes to its clients are short-term employees whereas most of the persons whom Zirkle hires to work in its warehouse are long-term employees. Based upon this distinction, Selective argues that its employees have little in common economically with Zirkle's employees. The gap between the two groups is widened, says Selective, by the fact its employees have the ability to move from client to another client if it makes sense to do so. Zirkle's employees, by contrast, have a harder time finding a new employer.

These arguments are insufficient to defeat a finding of commonality. While Selective may be correct in asserting there are material economic differences between short-term and long-term employees, Rule 23(a)(2) does not require the plaintiffs to demonstrate that all questions of law and fact are common to the class. *Hanlon*, 150 F.3d at 1019. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* Here, commonality within Subclass (A) is established by two factors. First, Selective is alleged to have conspired with one or more of the individual Zirkle defendants to hire illegal workers. Second, Zirkle Fruit Company set the wages for both the workers whom it hired and the workers whom Selective hired. Given the allegation of an agreement between both employers, and the allegation that one employer established the wages for all warehouse workers, there are questions of law and fact that are common to the members of Subclass (A).

### 3. Typicality

The plaintiffs must prove the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). As the Ninth Circuit has observed, "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Han-*

*lon,* 150 F.3d at 1020. The defendants challenge the existence of typicality. For one thing, they claim the named plaintiffs will be preoccupied with defenses that are unique to them. For another thing, they submit the plaintiffs must prove each worker's motivation for accepting employment at reduced wages. This issue cannot be resolved without fact-specific inquiries into each employee's subjective motivation.

### (a) unique defenses

The defendants allege that, although the plaintiffs knew Zirkle and Matson were employing illegal workers, they failed to report the violations to an appropriate authority. As a result, the defendants asserted a number of affirmative defenses. These included contributory fault, contributory negligence, waiver, consent, acquiescence, ratification, estoppel, *in pari delicto,* unclean hands, equal involvement, payment, failure to mitigate, and/or assumption of the risk. The existence of these defenses, say the defendants, will prevent the plaintiffs from adequately representing the interests of other class members. This argument can have force in certain circumstances. *See Hanon,* 976 F.2d at 508. ("a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it' " (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991))). Here, however, the defenses have been stricken, for the most part, by the order of February 23, 2004. Consequently, there no longer is any need to worry about the disruptive presence of unique defenses.

### (b) worker motivation

As part of their request for damages, the plaintiffs make the following allegation, "The legal members of the workforce accept the low wages with the knowledge that if they seek higher wages they will be fired and replaced with illegal workers." (Second Amended Complaint, ¶ 60, p. 16.) Zirkle assumes this allegation is one of the elements

of the plaintiffs' case and will require inquiry into each legal worker's subjective motivation. In an effort to establish just how idiosyncratic this inquiry will be, Zirkle has listed approximately 15 factors that can affect a worker's decision to accept a particular job. (Zirkle Defendants' Memorandum in Opposition to Motion for Class Certification at 22–23.) According to Zirkle, the plaintiffs have failed to demonstrate that the circumstances which led them to accept work at allegedly reduced wages are typical of other class members. This contention is unpersuasive. Initially, it is far from clear the plaintiffs will be required to identify the circumstances that motivated specific class members to accept the particular jobs they ultimately accepted. However, even if Zirkle is correct, there is a second problem. Variations among individual workers will be most relevant if, and when, a jury is asked to calculate damages. The fact that damage claims will vary among workers does not defeat typicality. As a general rule, typicality may exist even though "there is a disparity in the damages claimed by the representative parties and the other members of the class." 7A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1764, at 235–36, 241 (1986).

### 4. Adequacy of Representation

The plaintiffs must demonstrate that they will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). Adequate representation is essential because absent class members will be bound by any judgment entered in this action if a class is certified. *Hanlon,* 150 F.3d at 1020. Representation is deemed adequate if the named plaintiffs and their attorneys do not have conflicts with absent members and they will prosecute this action vigorously on behalf of the entire class. *Id.* Here, the defendants challenge the adequacy of plaintiffs' representation on several grounds.

#### (a) affirmative defenses

Zirkle and Selective Employment claim the plaintiffs' failed to protect their own interests while working for the defendants by failing to object to the presence of unauthorized workers in the defendants' respective workforces. The plaintiffs' failure to speak out, say Zirkle and Selective, means they cannot be trusted to represent the interests of absent class members. This contention is unpersuasive. Earlier, the Court ruled that the plaintiffs' failure to object to the presence of unauthorized workers can be asserted as a defense only in limited circumstances. Whether the defendants will be able to qualify for an instruction on any affirmative defense remains to be seen. Given this ruling, the plaintiffs' failure to object to the presence of unauthorized workers cannot be viewed as culpable or irresponsible behavior.

#### (b) employee opposition

Zirkle asserts that some of its current employees oppose the plaintiffs' lawsuit. According to Zirkle, this indicates a conflict between the named plaintiffs and absent class members. While some current may oppose the plaintiffs' lawsuit, a disagreement of this sort is insufficient to defeat certification. Courts generally have "declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit." *Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

#### (c) plaintiffs' participation

Zirkle argues the plaintiffs have failed to participate actively in, and demonstrate an adequate knowledge of, this case. This argument is rebutted by the fact each plaintiff has submitted to a deposition and each has a working knowledge of the case.

### B. Rule 23(b)(3)

#### 1. Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623, 117 S.Ct. at 2249. *See also Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 (9th Cir.), *cert. denied,* 534 U.S. 973, 122 S.Ct. 395, 151

L.Ed.2d 299 (2001). Here, the plaintiffs list several questions that they argue are common to all of the members of the proposed class, *viz.*, whether the defendants conspired to violate the Immigration and Naturalization Act and Washington common law; whether the plaintiffs' wages were depressed as a result of the conspiracy; and the extent of damages. The defendants do not deny that common issues exist. However, they submit that individual issues predominate over common issues. According to them, plaintiff-by-plaintiff fact-finding will be required to determine both the applicability of affirmative defenses and the existence of damages.

### (a) affirmative defenses

The defendants' arguments regarding affirmative defenses have lost most of their force in view of the Court's order of February 23, 2004. Since few of the defendants' affirmative defenses remain, and since it is unclear whether the defendants will be able to qualify for jury instructions with respect to the remaining defenses, there is no reason to believe the existence of affirmative defenses will undermine the cohesiveness of the proposed class.

### (b) damage calculations

The defendants assert that the impact of the alleged hiring scheme upon the plaintiffs' wages will vary dramatically from employee to employee based upon a number of factors. These include the site at which the employee worked; the type of job he performed; and whether he was paid by the hour or by his productivity. These circumstances, say the defendants, will destroy the cohesiveness of the class. As authority, the defendants cite a number of cases, including *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998).

In *Allison*, the plaintiffs brought a Title VII action alleging discriminatory employment practices at a large manufacturing complex. They sought certification of a class that could have included over 1000 members. The potential members were "current and former employees and unsuccessful applicants for employment in 'hourly' positions at Citgo's Lake Charles complex. They [were] spread across two separate facilities. They [were] represented by six different unions, [came] from five different skill groups, and work[ed] in seven different functional areas at the complex." *Id.* at 407. The district judge denied certification, and the Fifth Circuit ruled that his decision was not an abuse of discretion. In discussing the issue of predominance, the Fifth Circuit placed great weight on the plaintiffs' request for compensatory and punitive damages:

> [These claims] focus almost entirely on facts and issues specific to individuals rather than the class as a whole: what kind of discrimination was each plaintiff subjected to; how did it affect each plaintiff emotionally and physically, at work and at home; what medical treatment did each plaintiff receive and at what expense; and so on and so on. Under such circumstances, an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

151 F.3d at 419 (internal punctuation and citation omitted).

Contrary to the defendants, the Fifth Circuit's discussion of predominance provides little guidance here. If, in this case, the plaintiffs are able to prove the existence of an illegal hiring scheme, the jury will have to determine whether the scheme had an impact upon the wage rates established by the defendants. No doubt, wage rates will vary from job category to job category. It would not be surprising to learn, for example, that fork lift drivers are paid at a different rate than pickers. However, the analysis of wage rates will not require litigation of the individual circumstances that troubled the Fifth Circuit (*e.g.*, the emotional impact of an act of discrimination upon a particular class member). Instead, the jury will be asked to determine the rates of compensation that various jobs would have merited but for the alleged hiring scheme. Once the jury establishes the rates that should have been paid (if, in fact, the jury finds for plaintiffs), the jury can apply those rates to particular employees. This should not be an insurmountable task if, as seems to be the case, the defendants have records of the hours worked by their employees and the rates at which the employees were paid. Thus, the need for

individual damage calculations does not preclude a finding of predominance. *See Blackie,* 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment.[1]"). *See also Williams v. Sinclair,* 529 F.2d 1383, 1388 (9th Cir.1975) (citing *Blackie* ), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976).

#### (c) nature of plaintiffs' claims

The claims being asserted by the plaintiffs are not personal-injury claims. This is a significant consideration. In *Amchem,* the Supreme Court explained that in personal injury cases, "Each plaintiff ... has a significant interest in individually controlling the prosecution of [his case]"; each "ha[s] a substantial stake in making individual decisions on whether and when to settle." 521 U.S. at 616, 117 S.Ct. at 2246 (quoting *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 633 (3d Cir.1996)). The claims in this case are much different than the asbestos-related claims at issue in *Amchem.* Rather than being a personal-injury case, this is a civil RICO case. As such, it is roughly analogous to an antitrust case. *Cf. Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267–69, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992) (civil RICO was modeled after the Clayton Act). The Supreme Court mentioned this distinction in *Amchem.* "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." 521 U.S. at 625, 117 S.Ct. at 2250 (citing Comm. Note, Fed. R.Civ.P. 23).

#### 2. *Superiority*

■ "Rule 23(b)(3) also requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.' " *Hanlon,* 150 F.3d at 1023. The inquiry required by this provision involves a determination with respect to "whether the objectives of the particular class action procedure will be achieved in the particular case." *Id.* (citation omitted). "This determination," said the Ninth Circuit, "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Id.*

The defendants suggest that, instead of certifying a class action, it would be better to have individual plaintiffs bring actions of their own. The defendants give at least four reasons for suggesting this alternative. First, only a few workers have indicated any interest in the litigation. Second, prevailing workers are entitled to statutory damages and attorneys fees. Third, the plaintiffs have yet to provide a reliable means for identifying members of the proposed class, which could include as many as 20,000 members. Fourth, the existence of bifurcated proceedings increases the risk that the "damages" jury will pass on issues decided by the "liability" jury, thereby injecting Seventh Amendment problems into the case. *See Allison,* 151 F.3d at 419–20.

The plaintiffs argue that the defendants' analysis of superiority is inconsistent with the criteria set forth in Rule 23(b)(3). First, absent class members have little incentive to bring actions of their own. Few understand English very well; fewer still understand the American legal system. Second, the amount that could be recovered by any particular employee in this case is comparatively small—too small to justify individual actions by individual employees. Third, even if individual employees could find attorneys who were willing to represent them, little would be accomplished by repeatedly litigating the same disputes concerning discovery, liability, and causation. Finally, the threat of a Seventh Amendment problem is remote. Not only have the defendants agreed to bifurcation of liability and damages, but they have failed to demonstrate that issues of liability, causation, and damages are so interwoven that all issues must be presented to a single jury. *Cf. Arthur Young & Co. v. U.S. Dist. Court,* 549 F.2d 686, 696–97 (9th Cir.1977) (discussing bifurcation and the Seventh Amendment in the context of a fraud action).

---

1. *Blackie* continues to be cited for this proposition. *Smilow v. Southwestern Bell Mobile Sys.,*

323 F.3d 32, 40 (1st Cir.2003).

On balance, the considerations cited by the plaintiffs are far more weighty than those cited by the defendants. Absent class certification, it is unlikely that any plaintiff will have an opportunity to challenge the hiring scheme that the defendants allegedly engaged in. Preventing such outcomes is one of the reasons Rule 23(b)(3) was adopted. *Amchem,* 521 U.S. at 617, 117 S.Ct. at 2246 ("the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'" (quoting Kaplan, Prefatory Note 497)).

**SUBCLASS (B)**

■ Proposed Subclass (B) consists of persons who worked in Zirkle Fruit Company's orchards from November 5, 1999, to the present. Zirkle objects to certification of this class. For the most part, its objections parallel those discussed earlier. However, two objections require separate analysis. To begin with, Zirkle notes that Victor Sanchez is the only plaintiff who worked in its orchards. Furthermore, during the class period, he worked exclusively in an orchard that is located within a region known as the Royal Slope. At no time during the class period did he work in orchards that Zirkle operates in other areas of eastern Washington. Since Mr. Sanchez's tenure was limited to the Royal Slope orchard, Zirkle argues that Subclass (B) should be limited to persons who worked in that orchard during the class period. This is appropriate, says Zirkle because each orchard is managed separately, each has a separate hiring process, and the wages paid to workers vary from orchard to orchard. As authority, Zirkle cites *Doninger v. Pac. Northwest Bell,* 564 F.2d 1304 (9th Cir.1977). In that case, plaintiffs sought certification of an employment discrimination action against Pacific Northwest Bell ("PNB"). One of the issues was whether the plaintiffs had demonstrated commonality. As the Ninth Circuit observed, PNB was divided into six geographical areas, called "establishments." Each establish had its own affirmative action plan, although each plan was patterned after a general corporate plan. *Id.* at 1310. The Ninth Circuit inferred from these circumstances that different employment practices existed in each of PNB's establishments. *Id.* at 1311. Given the existence of different employment practices, and given the fact that the plaintiffs worked in just three of PNB's six establishments, the circuit court concluded that the plaintiffs had failed to demonstrate that proposed class presented common questions of law or fact. *Id.*

This case is similar to *Doninger* in that Zirkle Fruit Company conducts business in a number of locations and employment practices vary somewhat from location to location. However, this case differs in important respect. The plaintiffs allege that Zirkle's core leadership engaged in a conspiracy to hire employees whom they knew were not authorized to work in the United States. While this illicit agreement may have been implemented somewhat differently in each of Zirkle's orchards, the plaintiffs allege that the manager of each orchard was implementing a common scheme. The existence of a common scheme is sufficient to distinguish this case from *Doninger* and satisfy the requirement of commonality.

Zirkle has a second objection. In order to operate its orchards, Zirkle must hire workers to perform a wide variety of tasks. These include, but are not limited to, planting fruit trees, irrigating, fertilizing, pruning, spraying and, when harvest time arrives, picking the fruit. Mr. Sanchez performed several, but not all, of those tasks. Given the different skills that are needed for various jobs, and the different wages that are paid for various jobs, Zirkle denies that his claim is typical of all of its orchard workers. This contention is unpersuasive in light of *Staton v. Boeing; supra.* In that case, the Ninth Circuit upheld a district judge's findings with respect to commonality and typicality despite the fact the proposed class included a wide range of positions within the Boeing Company. In doing so, the circuit court agreed with the district judge's observation that the proposed class, although large, was "united by a complex of company-wide discriminatory practices." 327 F.3d at 953. This case is very similar. Here, all members of the proposed class are united in alleging their pay was depressed by unlawful schemes to hire unauthorized workers. Consequently, Mr.

Sanchez's experiences at Zirkle and his claim against Zirkle are sufficiently similar to other orchard workers to demonstrate the overlapping requirements of commonality and typicality.

**SUBCLASS (C)**

Without Mr. Aguirre, the plaintiffs cannot satisfy the overlapping requirements of either Rule 23(a) (commonality and typicality) or Rule 23(b)(3) (predominance). Thus, for the reasons indicated above, the Court declines to certify a class action against Matson Fruit Company.

**IT IS HEREBY ORDERED:**

The plaintiffs' motion for class certification (Ct.Rec.287) is granted in part and denied in part. Two classes are certified: Subclass (A) consists of persons who worked in Zirkle Fruit Company's warehouse from November 5, 1999, to the present whether Zirkle hired them directly or obtained them indirectly through Selective Employment Agency. Subclass (B) consists of persons who worked in Zirkle Fruit Company's orchards from November 5, 1999, to the present.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order and furnish copies to counsel.