Dan KATZ

v.

## CHINA CENTURY DRAGON MEDIA, INC., et al.

### No. LA CV11–02769 JAK (SSx).

United States District Court, C.D. California.

Dec. 18, 2012.

Laurence M. Rosen, Rosen Law Firm, Los Angeles, CA, for Dan Katz.

Bruce Halliday Jackson, Irene V. Gutierrez, Baker & McKenzie LLP, San Francisco, CA, Megan Rae Peitzke, Cozen O'Connor, Los Angeles, CA, Robert W. Hayes, Cozen O'Connor, Philadelphia, PA, Christopher F. Wong, Drinker Biddle & Reath LLP, David S. Eisen, Jennifer J. Moon, Patricia Ann Golson, Patrick Michael Kelly, Wilson Elser Moskowitz Edelman & Dicker L.L.P., Los Angeles, CA, for China Century Dragon Media, Inc., et al.

**Proceedings: (IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION (DKT. 156) AND GRANTING MOTION TO DISMISS CROSS–CLAIM OF WESTPARK CAPITAL DEFENDANTS AGAINST MALONEBAILEY LLP (DKT. 172)**

JOHN A. KRONSTADT, District Judge.

Andrea Keifer Deputy Clerk

## I. *Introduction*

Plaintiffs are shareholders of Defendant China Century Dragon Media ("CDM"). They have brought this putative class action on behalf of themselves and similarly-situated persons who purchased shares in CDM between February 7, 2011 and March 21, 2011. Certain Plaintiffs allegedly purchased shares in the February 2011 Initial Public Offering ("IPO") by CDM; others made their purchases in the after-market. The defendants in this action are certain former directors and officers of CDM (the "Director Defendants"), those who allegedly controlled CDM (the "Individual Defendants"), CDM's former auditor—"MaloneBailey," and certain parties who participated in underwriting the IPO (the "Underwriter Defendants").

Plaintiffs allege that Defendants are responsible for false and incomplete statements about, *inter alia,* the revenues, income and cash position of CDM, that were made in the prospectus and registration statement issued in connection with the IPO. These claims arise under Section 11, 15 U.S.C. § 77k (the First Cause of Action), Section 12(a)(2), 15 U.S.C. § 77l (the Second Cause of Action), and Section 15, 15 U.S.C. § 77o (the Third and Fourth Causes of Action), of the Securities Act of 1933 (the "1933 Act"). The Section 11 claims are brought against all defendants, except Richard Rappaport ("Rappaport"), the Chief Executive Officer of Underwriter Defendant WestPark. The Section 12(a)(2) claims are brought against CDM and Underwriter Defendant Joseph Gunnar & Co., LLC ("Gunnar"). The Section 15 claims are brought against the Director Defendants and Rappaport.

Two motions are now pending: (i) Plaintiffs' Motion for Class Certification, Dkt. 156; and (ii) MaloneBailey's Motion to Dismiss the Cross–Claim of the Underwriter Defendants for Indemnity and Contribution, Dkt. 172. On November 5, 2012, the Court conducted a hearing on both motions and took them under submission. For the reasons stated in this Order, the Court GRANTS, in part, the Motion for Class Certification, GRANTS the Motion to Dismiss the Cross–Claim for Indemnity with prejudice, and GRANTS the Motion to Dismiss the Cross–Claim for Contribution without prejudice.

## II. *Factual Allegations*

CDM is an American company that sells advertising on Chinese television. All of CDM's operations are conducted by Beijing CD Media Advertising Co., Ltd. ("CD Media Beijing"), a Chinese company. Huizhou CD Media Co., Ltd. ("CD Media Huizhou") is a Chinese company that is a wholly owned subsidiary of CDM. CD Media Huizhou has a series of contractual relationships with CD Media Beijing through which CDM controls CD Media Beijing's operations.

CDM filed its registration statement with the SEC in February 2011. The registration statement included a prospectus for the public offering of its common stock. The prospectus represented CDM's revenues from Fiscal Year ("FY") 2009 as approximately $75 million and from FY 2008 as approximately $45 million; it represented CDM's profits from FY 2009 as nearly $15 million and from FY 2008 as more than $8 million. Second Amended Complaint ("SAC"), Dkt. 113, ¶ 120. However, CD Media Beijing's filings with the Chinese State Administration for Industry and Commerce ("SAIC") made materially different statements about its finances. Thus, these SAIC filings represented CD Media Beijing's revenues from FY 2009 as only $9.5 million and from FY 2008 as only $15 million. In addition, these filings represented CD Media Beijing's profits from FY 2009 as $260,000 and from FY 2008 as approximately $360,000. SAC ¶ 119. Plaintiffs allege that, because all of CDM's operations run through CD Media Beijing, its financial information should be substantially the same as that of CD Media Beijing. Plaintiffs allege that the smaller SAIC numbers are the true numbers, and that the prospectus numbers, on which Plaintiffs relied in purchasing CDM shares, were false.

Trading in CDM stock began on February 7, 2011 on the NYSE Amex exchange. On March 21, 2011, Amex halted trading on CDM's stock; a week later, it began proceedings to delist the stock. MaloneBailey, then the auditor of CDM, issued a resignation letter indicating that CDM's accounting rec-

ords had been falsified and that there were discrepancies in its financial audit from FY 2010. This letter also stated that MaloneBailey was withdrawing its audit opinion as to financial years 2009 and 2008. SAC ¶¶ 170–73. Plaintiffs allege that they were injured because CDM stock traded after the IPO at $5.25 per share, but has fallen to only $0.30 per share, a nearly 95% decline.

Certain evidence has been presented in support of the foregoing allegations. It includes: (i) correspondence from counsel to CDM to the Securities and Exchange Commission ("SEC"), SAC, Exh. 1; (ii) excerpts of CDM's Form S–1/A Registration Statement filed with the SEC, Rosen Decl., Exh. 1 Dkt. 181–2; (iii) Responses and Objections of the Underwriter Defendants to Interrogatories, *id.*, Exh. 2, Dkt. 181–3; and (iv) trade data with respect to the purchases of CDM stock during the class period. Rosen Decl., Dkt. 158 Exh. 4. Plaintiffs also present evidence with respect to the appropriateness of their selection as class representatives and the selection of their counsel as class counsel. Dkt. 158, Exhs. 1–3.

### III. *The Motion to Dismiss*

#### A. The Cross–Claim

The Underwriter Defendants brought a cross-claim against CDM's former auditor, MaloneBailey, asserting claims for indemnity and contribution. Dkt. 160 The cross-claim alleges the following:

265. [Underwriter Defendants] reasonably relied upon MaloneBailey's audits of [CDM's] financial statements to assure their accuracy.

266. Plaintiffs claim that there were material misstatements in the financial statements [CDM] included within the Registration Statement and Prospectus and that MaloneBailey failed to identify these errors because it failed to comply with Generally Accepted Auditing Standards ("GAAS") in conducting its audits and otherwise acted negligently.

267. While denying that there were material misstatements in the financial statements [CDM] included within the Registration Statement and Prospectus, and all

liability to plaintiffs[,] to the extent that plaintiffs establish material misstatements in those financial statements and that MaloneBailey failed to comply with GAAS or conducted its audits negligently, [Underwriter Defendants] are entitled to indemnity or contribution from MaloneBailey for any damages that may be awarded against them.

#### B. The Parties' Contentions

MaloneBailey contends that the federal securities laws control the nature and scope of any rights among co-defendants to seek indemnity or contribution. It further contends that, under the controlling federal law, there is no right to indemnification between or among parties who are defendants in an action brought under Section 11 of the 1933 Act. *Laventhol, Krekstein, Horwath & Horwath v. Horwitch,* 637 F.2d 672 (9th Cir. 1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). MaloneBailey next argues that, although a claim for contribution may be advanced by co-defendants in an action brought under the 1933 Act, such a claim does not accrue until the party seeking contribution has made some payment in connection with the action. *Asdar Group v. Pillsbury Madison and Sutro,* 99 F.3d 289 (9th Cir.1996). Because the Underwriter Defendants have made no such payment, MaloneBailey argues that their potential claims for contribution have not accrued.

The Underwriter Defendants respond with two principal arguments. First, they contend that the claims for contribution and indemnity arise under state law, and that such a basis for indemnity and contribution has been recognized in federal securities actions, including *Laventhol.* Second, with respect to whether a claim for contribution has accrued, they rely on the following language from Civil Rule 13(g), and argue that it permits the filing of a claim for contribution that may arise from a future payment by the cross-claimant:

A pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if

the claim relates to any property that is the subject matter of the original action. The crossclaim may include a claim that the coparty is or *may be liable* to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

Fed.R.Civ.P. 13(g) (italics added).

## C. Analysis

### 1. *The Indemnity Claims Fail*

In *Laventhol* the Ninth Circuit made clear that, as a matter of law, there cannot be a claim for indemnity between or among co-defendants in an action brought against them under the Securities Act of 1933. Thus, in upholding the dismissal of claims for indemnity brought by accountant defendants against officer and director defendants, the Ninth Circuit stated:

> The cross claim for indemnity for the alleged violations of the Securities Act of 1933 was properly dismissed by the district court. In extending liability to underwriters and those who prepared misleading statements, the purpose of the Act is regulatory rather than compensatory, and permitting indemnity would undermine the statutory purpose of assuring diligent performance of duty and deterring negligence. See 3 L. Loss, Securities Regulation 1831 (1961 2d ed. & Supp. 1969). In *Heizer Corp. v. Ross, supra,* 601 F.2d [330] at 334 [ (7th Cir.1979) ], the court stated:
>
> > "Whereas contribution supports the policy of securities legislation, indemnification tends to frustrate and defeat it. A securities wrongdoer should not be permitted to escape loss by shifting his entire responsibility to another party. If indemnification were allowed, those found liable for the breach of a statutory obligation might escape liability as effectively as if contribution were denied."

637 F.2d at 676.

The Ninth Circuit restated this principle in *Stewart v. American International Oil & Gas Co.,* 845 F.2d 196, 200 (9th Cir.1988):

> Moreover, the district court correctly found that as a matter of law Meridian was not entitled to indemnity or contribution for any of its fraud claims. Indemnity is

unavailable under the federal securities laws. *Laventhol, Krekstein, Horwath & Horwath v. Horwitch,* 637 F.2d 672, 676 (9th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). A simple reading of the California statutes and the common law of fraud would have yielded the same conclusion—hat a securities wrongdoer or anyone who has committed an active fraud cannot escape loss by shifting his responsibility to another party.

Under these clear statements of the law, the Underwriter Defendants' claims for indemnity fail under the controlling federal law. No more persuasive is their argument that their claim for indemnity may be premised on state law. In citing *Laventhol* to support this position, Dkt. 178 at 6, the Underwriter Defendants misread the case. Thus, the plaintiffs in *Laventhol* brought claims under the Securities Act of 1933 as well as certain pendent state law claims in connection with their purchase of limited partnership interests. After concluding that no claim for indemnity could proceed as a matter of federal law, the Ninth Circuit addressed the issue of potential indemnity with respect to the pendent claims:

> Appellants also seek indemnity from appellees on two common law counts of plaintiffs' first amended complaint: Count IV, which alleges that the Bank is liable for having negligently failed to investigate Doug Frank and Western, or to discover the misappropriation, mismanagement, and fraud perpetrated on Western by Doug Frank, its officers and directors; and Count V, which alleges that the defendants' conduct "constitutes a breach of the common law principles of trust and fiduciary duty."
>
> The parties do not dispute that state law governs the common law counts pendent to the federal securities claims. They cannot agree, nor has the trial court reached the issue, as to what local law applies. This is a determination we plainly cannot make on the limited record before us. Furthermore, even if we were to determine which state law applies (the parties suggest it is Arizona or New York law), there are unresolved factual issues as to the relationship

between the parties which must be decided before an entitlement to indemnity can be established under the law of either of these states. *See Busy Bee Buffet v. Ferrell*, 82 Ariz. 192, 310 P.2d 817 (1957); *Dole v. Dow Chemical Co.*, 30 N.Y.2d 143, 282 N.E.2d 288, 331 N.Y.S.2d 382 (1972).

*Laventhol*, 637 F.2d at 676. Clearly, this is not a statement that indemnity claims that may arise under state law among defendants to a state law claim are also available between defendants to a claim under the Securities Act of 1933. Because there are no state law claims brought by Plaintiffs in this action, the Underwriter Defendants' argument about the viability of its indemnity claims under state law fails.

### 2. *The Contribution Claims are Premature*

■ Claims for contribution are allowed between or among defendants in an action brought against them under the Securities Act of 1933. Thus, such claims are permitted so long as there is a statutory basis under which each would have potential liability for the claims advanced by the plaintiff in the action for which contribution is sought. *Id.* at 674. Such claims are expressly permitted against both the Underwriter Defendants and MaloneBailey under Section 77k(f) of the Act. It provides, in pertinent part, that "every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment, unless the person who has become liable was, and the other was not, guilty of fraudulent misrepresentation."

In *Asdar Group*, the Ninth Circuit considered the timing of the accrual of claims for contribution brought in connection with claims brought by plaintiffs under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. 99 F.3d at 294. There, the issuer of securities, having been found liable to the purchasers of these securities under the foregoing provisions, filed an action seeking, *inter alia*, contribution from the law firm that had advised the issuer in connection with the issuance of the securities. The district court determined that the action was time barred and dismissed it. The Ninth Circuit affirmed. The court first determined that the applicable statute of limitations for the contribution claim was the one provided under either Section 9 or 18 of the Securities Exchange Act of 1934—respectively, 15 U.S.C. § 78i(e) and 15 U.S.C. § 78r(c). The court then turned to the language common to each of these sections: " '*No* action shall be maintained to enforce *any* liability created under' those sections unless brought within the one-year/three-year limitations period. 15 U.S.C. §§ 78i(e), 78r(c)." *Id.* at 293 (emphasis in original). The court went on to consider when such a cause of action for contribution would accrue under these provisions. It concluded that it would accrue "when the defendant has satisfied the judgment against her." *Id.* at 296. It is at that time that the party seeking contribution "suffers loss by payment of a judgment or settles the claims involving a greater share of the total debt than the party's proportionate liability." *Id.* at 295–96.

■ The statute of limitations that applies to the substantive claims in the present case is set forth in Section 13 of the Securities Act of 1933, 15 U.S.C. § 77m. Its core language is identical to that of Sections 9 and 18 of the 1934 Act: "No action shall be maintained to enforce any liability created" under the statute unless it is brought within "one year after the discovery of the untrue statement or the omission" and in no event "more than three years after the security was bona fide offered to the public, or . . . more than three years after the sale." Because the operative language is identical to that at issue in *Asdar*, the same rule applies as to accrual. Thus, a cause of action for contribution does not accrue until a judgment has been paid.

These clear rules are not altered by Civil Rule 13. Thus, its language that a crossclaim "may include a claim that the coparty is *or may be liable* to the crossclaimant for all or part of a claim asserted in the action against the crossclaimant" is not a substantive statement of law that applies in all actions, including those brought in connection with the Securities Act of 1933. Under the Federal Rules Enabling Act, 28 U.S.C.

§ 2072, this is not permitted. That statute provides that "(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts," but that "(b) Such rules shall not abridge, enlarge or modify any substantive right." Thus, Rule 13 is only a procedural statement of the nature of claims that, if otherwise timely and proper, may be included in a cross-claim. Therefore, the adoption of this rule of civil procedure did not effect an amendment to the securities laws, and could not have done so.

No judgment has been entered in this action against the Underwriter Defendants. As a result, they cannot have made any payment of a judgment. Consequently, their claims for contribution are premature. They are dismissed without prejudice to their being re-filed should they accrue and are otherwise viable.

## IV. *The Motion for Class Certification*

### A. The Proposed Class

The motion seeks the certification of the following class:

> All persons or entities that purchased or otherwise acquired China Century Dragon Media, Inc. ("CDM" or the "Company") common stock in the Company's public offering (the "Offering") on February 7, 2011 or purchased or otherwise acquired CDM stock in the aftermarket pursuant and/or traceable to the Company's registration statement and public offering prospectus issued in connection with the Offering during the period from February 7, 2011 through March 21, 2011 (the "Class Period"). Excluded from the Class are Defendants, the present and former officers and directors of CDM and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

Dkt. 156–1.

### B. Class Action Standards

#### 1. *In General*

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011). Under Rule 23 of the Federal Rules of Civil Procedure, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). That "rigorous analysis" will "frequently" include "some overlap with the merits of the plaintiff's underlying claim." *Dukes,* 131 S.Ct. at 2551. In seeking class certification, a putative class representative plaintiff must establish that the proposed class meets each of the prerequisites of Rule 23(a). *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). These are: (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy of representation. Fed.R.Civ.P. 23(a). Further, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* 131 S.Ct. at 2551 (italics in original). Once these four prerequisites are satisfied, a court must consider whether the proposed class can be maintained under the standards of Rule 23(b). *See, e.g., Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996).

To establish a claim under Section 11 or Section 12(a)(2) of the Securities Act of 1933, a plaintiff need not show scienter, reliance or loss causation. *Rubke v. Capitol Bancorp, Ltd.,* 551 F.3d 1156, 1161 (9th Cir.2009). Instead, to establish such a claim, a plaintiff must allege that the registration statement contained an omission of misrepresentation that was material, "that is, it would have misled a reasonable investor about the nature of his or her investment." *Id.*

#### 2. *Rule 23(a) Prerequisites*

##### a) Numerosity

Rule 23(a)(1) requires that, in order to be certified, a class must be "so numerous that

joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). " 'Impracticability' does not mean 'impossibility', but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964). No specific number of members is needed to warrant a class action. *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir.1967).

### b) Commonality

Rule 23(a)(2) requires that the case involve "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998). The commonality requirement is satisfied only by a common question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. "Requiring there to be common questions of law or fact prior to certifying a class serves chiefly two purposes: (1) ensuring that absentee members are fairly and adequately represented; and (2) ensuring practical and efficient case management." *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir.1998).

### c) Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon*, 976 F.2d at 508. "[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir.2010).

### d) Adequacy of Representation

The requirement of adequacy contained in Rule 23(a)(4) ensures that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequacy requirement is needed to protect the due process rights of all of the class members; in a class proceeding, all class members will be bound by the final judgment. *See Richards v. Jefferson County*, 517 U.S. 793, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996). The determination of adequacy hinges on whether the named plaintiffs and their counsel have any conflicts of interest with other class members and whether they will prosecute the action vigorously. *Hanlon*, 150 F.3d at 1020.

### 3. *Rule 23(b)(3) Requirements*

If the Rule 23(a) prerequisites are satisfied, a court next considers whether the proposed class can be maintained under at least one of the subparts of Rule 23(b). *See, e.g., Valentino*, 97 F.3d at 1234. Here, Plaintiffs seek certification under Rule 23(b)(3), which has two requirements: (1) that "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

### a) Predominance of Common Questions

The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Determining whether common questions predominate requires the court to weigh the common questions in the case against the individualized questions, a more in-depth inquiry than the Rule 23(a)(2) question of whether common questions are at issue in the case. "[I]t is clear that considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the

underlying cause of action." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir.2011).

### b) Superiority of Class Action

In evaluating whether a class action is the superior mechanism for handling a case, a court must consider: (1) the interest of class members in individually controlling prosecution of separate actions; (2) the extent and nature of any pending litigation concerning the controversy; (3) the desirability of litigating the claims in the particular forum where the class action is filed; and (4) difficulties likely to be encountered in managing the class action. Fed.R.Civ.P. 23(b)(3). A class action is superior "[w]here classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234.

### C. The Parties' Contentions

Plaintiffs contend that the standards of Rule 23 are met as to all claims. They argue that there are numerous persons who purchased shares of CDM, noting that it is undisputed that there were thousands of stock purchase transactions during the proposed class time period of February 7, 2011 to March 21, 2011. They contend that there are several common questions: whether there were false statements in the registration statement; whether the Underwriter Defendants performed adequate due diligence; whether MaloneBailey performed an adequate investigation prior to the issuance of its audit letter; whether defendant Westpark Capital was controlled by defendant Richard Rappaport; whether certain individual defendants were "control persons" as defined by the 1933 Act; and the measure of damages. They assert that the class representatives and their counsel will be adequate because of the substantial prior experience of counsel and the willingness of the representatives to dedicate appropriate time and energy to the case. Finally, they argue that the standards of Rule 23(b)(3) are met, because the common issues predominate, making the class proceeding a superior means of litigating the underlying claims of all class members.

Defendants contend that the standards of Rule 23 have not been, and cannot be, met in this action. They advance several bases for this position, including: (i) there are subgroups within the proposed class based on when class members purchased shares because there was more information available as time passed that was relevant to assessing the materiality of the claimed misrepresentations and omissions; (ii) there are subgroups based on whether class members purchased shares in the IPO or in the after-market; (iii) there are class members who purchased and sold shares during the proposed class period, and others who made short sales of the shares, such that some or all of such persons did not sustain any losses when the share price dropped; (iv) individual assessments must be made with respect to the materiality of the claimed false and omitted information because different class members may have had different levels of knowledge about the financial and other disclosures of Chinese companies; (v) there are many affirmative defenses, including loss causation, and they may apply in a different manner to various class members, including whether any such persons had knowledge about or concerning the alleged omissions and misrepresentations; and (vi) the Section 12(a)(2) claims can be brought only against a single defendant—Gunnar & Co.—making such claims unique, and distinct from all other claims that are proposed for litigation on a class basis.

### D. Analysis

#### 1. *Rule 23(a)*

##### a) Numerosity

■ It is undisputed that there were thousands of purchases and sales of CDM shares through the IPO and in the after-market during the proposed class period. Indeed, there were 1,655 purchases and sales on a single day of the period: February 11, 2011. Evidence has been presented in support of these figures. Rosen Decl., Exh. 4, Dkt. 158–4. That there were thousands of transactions lead to the reasonable inference that there were hundreds, if not thousands of individuals who made these trades and by whom claims can be made under Section 11.

Consistent with that inference is the content of certain interrogatory responses by the Underwriter Defendants. Dkt. 181–3 at 4 ("approximately 264 persons purchased CDM common stock in the Offering . . . .") Given these significant numbers, the standard of Rule 23(a) is met with respect to the Section 11 claims; it would not be practical to join all of the class members in a single action.

Significantly, the Underwriter Defendants do not present substantial arguments in their opposition to the motion that the numerosity requirement has not been met. Dkt. 176. Their brief focuses instead on other issues, while observing casually that "[t]here is no evidence whatsoever in the record to determine, for instance, how many individuals purchased in the IPO and held their shares through the delisting of [CDM's] shares." *Id.* at 2. MaloneBailey mentions this element of Rule 23 in its opposition, Dkt. 175, but does not contend that the number of purchasers of the shares is too small to satisfy the requirements of Rule 23(a). Instead, MaloneBailey acknowledges that the number of purchasers "may be over the threshold for 'numerosity,' . . . ." *Id.* at 6. MaloneBailey then argues that numerosity is not satisfied because there are three distinct groups of purchasers: those who purchased and sold during the class period and prior to the disclosure of the alleged fraud; those who purchased when they knew of the imminent delisting of CDM; and those who purchased when they knew of the differences between the financial disclosures of CDM. These arguments are not persuasive as to numerosity; they are directed to the commonality issue. Moreover, MaloneBailey has presented no evidence as to the number of persons who may be within each of the groups it has identified.

In contrast, no evidence has been presented with respect to the volume of trades, or potential number of traders, involved with respect to the claims made under Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77*l.* These claims are limited to purchases of the CDM shares from a single defendant: Joseph Gunnar & Co. LLC ("Gunnar"). A single, proposed class representative—Peter Van Nuis—made purchases from Gunnar during the proposed class period. Based on the record evidence presented in support of the motion, there is not an adequate showing as to the numerosity element as to the Section 12 claims against Gunnar.[1] For this reason, Plaintiffs have failed to meet their burden with respect to the certification of this component of their claims, *i.e.*, the Second Cause of Action.[2]

#### b) Commonality

There are numerous common questions that are raised by this action, *i.e.*, ones as to which the "determination of truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. Material common questions in this matter include: whether there were false statements or material omissions in the registration statement and prospectus; whether the Underwriter Defendants performed adequate due diligence; whether MaloneBailey conducted an appropriate investigation prior to the issuance of its audit letter; and whether certain individual defendants are "control persons" under the 1933 Act.

The Underwriter Defendants argue that the affirmative defenses that they anticipate will not focus on common questions, but matters unique to each class member. For example,

---

1. In a footnote to their opening brief, Plaintiffs contend that they have sought certain discovery from the Defendants on the number of purchases that were made in the IPO. Dkt. 157 at 7 n.3. No mention is made of pending discovery from Gunnar on issues related to Section 12. Further, in the reply materials that Plaintiffs filed, Dkt. 181, Plaintiffs provide some information obtained in discovery from the Underwriter Defendants with respect to the number of persons who purchased the shares of CDM, Dkt. 181–3 at 4, but make no reference to the number of proposed class members who have claims under Section 12 of the

1933 Act as a result of stock purchases from Gunnar.

2. In light of this deficiency, the Court does not address whether Plaintiffs have sufficiently shown that the other elements necessary for certification are met as to the Second Cause of Action, including commonality and adequacy of representation. The later discussion of these elements relates solely to the First, Third and Fourth Causes of Action.

they assert that a Section 11 claim is barred when the purchaser "knew of [an] untruth or omission" at the time of the purchase. 15 U.S.C. § 77k(a). And, they refer to numerous articles that were published prior to the class period from which a class member may have learned about other Chinese companies who had acted improperly in raising capital in the United States. Rappaport Decl., Exhs. A–L, Dkt. 176-2–176-13. What these arguments and the proffered stories do not show, however, is that such issues are sufficient to outweigh the commonality of the issues previously discussed. Further, without evidence as to what the proposed class representatives knew about these and similar publications—something that might have been developed had Defendants elected to depose the proposed class representatives—there is no showing that the proposed affirmative defense of knowledge cannot be adjudicated on a class basis. Thus, Defendants have not argued that there was actual knowledge about the financial condition of CDM, but knowledge about reports about other Chinese companies. The same is true with respect to the argument by MaloneBailey that there is an absence of commonality because the time of purchase is important to an assessment of the merits of the claims of the class members. Once again, there is no evidence to support this argument or any showing that such matters cannot be addressed on a classwide basis when the Plaintiffs contend that the misstatements and omissions are tied to the prospectus and registration statement.

### c) Typicality

■ As noted earlier, "the typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez,* 591 F.3d at 1124. Here the claims of the class representatives meet this standard. Like the proposed class members, the class representatives purchased shares in CDM. They claim that they did so at a time that the registration statement and other offering materials contained material misrepresentations and omissions. Whether, as the Underwriter Defendants contend, Dkt. 176 at

13–14, there is a different rule under Section 11 and Section 12 as to who bears the burden of proof as to a purchaser's knowledge of matters that would preclude an action as to the misrepresentations or omissions, does not change the analysis. The Court has already concluded that the Section 12 claims cannot proceed on a classwide basis. No more persuasive are Defendants' arguments about the distinction between those class members who purchased shares during the IPO and those who purchased in the aftermarket. All of the claims are based on the same alleged misrepresentations and omissions.

### d) Adequacy of Representation

There is no dispute as to this factor. Thus, there is no claim that the proposed class representatives or counsel will not adequately represent the interests of the class members. There is no evidence of any conflicts of interest with other class members, and there is evidence that the proposed class representatives and class counsel will prosecute the action vigorously.

### 2. *Rule 23(b)(3)*

### a) Predominance of Common Issues

Rule 23(b)(3) requires that: (i) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Both of these elements are satisfied in this case.

■ The predominance of common questions here is established by several factors. *First,* the core inquiry that underlies the Section 11 and Section 15 claims is whether the prospectus and registration statement contained material, false information. Plaintiffs contend that they do because they presented false financial statements for CDM. The determination whether these documents contained false information is plainly a question common to the claims of the proposed class members. The result is the same with respect to other central issues that are raised by the present claims: whether the Under-

writer Defendants performed adequate due diligence; whether MaloneBailey performed an adequate investigation prior to the issuance of its audit letter; whether defendant Westpark Capital was controlled by Rappaport; and whether certain the Director Defendants and Rappaport were "control persons" as defined by the 1933 Act.

■ *Second,* the suggestion by the Underwriter Defendants that a determination of the materiality of the alleged misrepresentations will require individualized analyses for class members is unpersuasive. Whether information is material for purposes of a Section 11 claim is determined by the application of an objective standard: "to fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (adopting materiality standard applicable in the proxy-solicitation context under § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), to claims made under § 10(b) of that Act).[3] Accordingly, testing the materiality of the alleged misrepresentations does not turn on an individualized analysis. Instead, whether the alleged misrepresentations were material in light of published reports about the accounting practices of other Chinese companies[4] is subject to the objective, reasonable person standard—one that can be adjudicated on a classwide basis.[5]

*Third,* although the nature of the proof that is anticipated with respect to affirmative defenses is relevant to an analysis under Rule 23(b)(3), *Dukes,* 131 S.Ct. at 2558–59, the consideration of such defenses does not lead to a different result in the analysis of whether common issues predominate in this action. Defendants focus on two affirmative defenses in opposing certification, arguing that each will require individualized assessments as to class members: (i) the claims of any class members who knew that the alleged misrepresentations were just that based on, *inter alia,* their review of articles published about Chinese companies prior to the class period, are barred under 15 U.S.C. § 77k(a); and (ii) there is no loss causation with respect to the those class members who sold their shares prior to the suspension in the trading of CDM shares.

As to the issue of alleged knowledge, Defendants have presented no evidence that any class member had any knowledge that the specific, alleged misrepresentations as to CDM were false; indeed, Defendants have presented no evidence of what any individual putative class member knew at the time of any purchase of CDM shares. Defendants have presented only 12 articles and Internet blog postings about certain business and accounting practices of certain Chinese companies that were published or posted between August 25, 2010 and February 10, 2011. Rappaport Decl., Exhs. A–L, Dkt. 176–2—176–13.[6] No evidence is presented as to the amount of readership or circulation of these publications or postings. Similarly, there is no evidence as to the market perception of the reliability of certain of the Internet authors. To be sure, these articles make frequent reference to the variation between the

---

**3.** The Ninth Circuit has recognized that the same materiality standards apply under the 1933 and 1934 Acts: "The plaintiffs appear to contend that, if the bespeaks caution doctrine is viable, it applies only to section 10(b) claims and not to section 11 claims. This argument is plainly wrong. As noted, the doctrine is primarily an application of the materiality concept, which applies equally to both statutory provisions. *E.g., Halkin v. VeriFone Inc. (In re VeriFone Sec. Litig.),* 11 F.3d 865, 868–69 (9th Cir.1993). Accordingly, courts have applied the doctrine to section 11 claims as well as section 10(b) claims. *See, e.g., In re Donald J. Trump Casino Securities Litigation–Taj Mahal Litigation,* 7 F.3d 357, 365 (3d Cir.1993); *I. Meyer Pincus & Associates, P.C.*

*v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 761 (2d Cir.1991); *see generally Disclosures,* 49 Bus. Law. at 483." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1415 n.3 (9th Cir.1994).

**4.** *See* Rappaport Decl., Exhs. A–L, Dkt. 176–2–176–13.

**5.** MaloneBailey essentially concedes this point by acknowledging the objective character of the materiality element of Section 11. Dkt. 175 at 4, n.3.

**6.** Exhibits A and D are the same article, but posted on different dates.

accounting numbers presented by Chinese companies in their SEC and SAIC filings, and provide a variety of potential explanations for this disparity, which range from the level of the audit of the figures to potential tax evasion. They also analyze many other potential reasons for the disappointing performance of shares of Chinese-based companies traded in the United States. But, there is no showing that awareness of this sort of generic information cannot be tested on a class basis. Thus, Defendants will be able to pursue with class representatives and class members discovery about their awareness of these and similar publications. And, through that process, Defendants may be able to present evidence relevant to the knowledge defense. But, at this stage, the information proffered by Defendants is insufficient to establish that individual issues will necessarily predominate in connection with the presentation of the knowledge defense. As a result, the proffer is insufficient to outweigh the commonality of the issues germane to the presentation of Plaintiffs' claims for which evidence has been presented.

The record here is entirely different from that presented to the district court in *New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Trust,* 477 Fed.Appx. 809 (2d Cir.2012), a case on which the Underwriter Defendants place principal reliance. There, the Second Circuit affirmed the district court decision denying class certification, applying an abuse of discretion standard. In discussing the district court's conclusion that common issues did not predominate with respect to whether class members knew of the alleged untruth or omission at the time of their respective purchases of securities, the Second Circuit stated:

> The district court held that to determine whether each purchaser had actual knowledge of the specific untruths or omissions at the time of its purchase would require many individualized inquires, outweighing the common issues in the case. 272 F.R.D. at 168–70. Recognizing that we are "noticeably less deferential when the district court has denied class status than when it has certified a class," ... we nonetheless cannot on this record hold the district court to have abused its discretion in con-

cluding that individual issues would predominate.

*Id.* at 813 (citation omitted).

A review of the district court's decision shows that it considered a substantial amount of evidence, including that presented through expert and percipient witnesses, with respect to the knowledge of the proposed class members as to securities that they purchased. The subject securities were mortgage-backed securities formed from residential mortgages. 272 F.R.D. at 162. They were sold in a series of offerings over a two-year period. *Id.* The district court noted that defendants argued that "certain purchasers had knowledge that the loan originators were 'loosening and lowering' underwriting guidelines. This presents a serious challenge to class certification because it provides for unique defenses that require a great deal of individualized evidence." *Id.* at 168. Further, the court found that "different putative class members have different levels of knowledge regarding the underwriting guidelines and practices based on their respective levels of sophistication and time of purchase." *Id.* In addition, the evidence showed that the investment adviser to one of the plaintiffs had complete discretion over its client's investments, and had special access to "mortgage originators, including the largest originator of loans comprising the securities at issue in this litigation." *Id.* at 169. The investment advisor used this access to have meetings with the issuer to learn about the issuer's "procedures ... in servicing loans and [try to learn] about any changes to the underwriting guidelines." *Id.* Additional evidence showed that this investment adviser knew that the underlying loans did not comply with all underwriting standards and presented heightened risks. The district court found that other evidence showed individualized issues because other putative class members were sophisticated investors, such as JP Morgan, "with significant experience in asset-backed securities markets." *Id.* The court also concluded that the securities were purchased at different times, such that those who purchased later during the two-year period "had the benefit of different levels of information about the lending practices rele-

vant to investment in mortgage backed securities." *Id.* Thus, the evidence showed that throughout the relevant period more and more information became publicly available, including reports of government actions or investigations, analysts reports, news items and raw data. This information cast increasing levels of doubt on whether the loans comprising mortgage backed securities were originated in conformity with appropriate guidelines and risk analyses.

*Id.* 169–70. And, as the court stated as to other investors:

> Many of these investors were steeped in the mortgage-backed securities market and purchased hundreds of millions of dollars of RALI [Residential Accredited Loans, Inc.] certificates.... [T]he background of many RALI purchasers makes clear that relevant individual issues exist concerning the level of knowledge possessed by different putative class members.

*Id.* at 170.

Defendants here have presented no similar evidence. There is simply no showing that those who purchased CDM shares had special access to information or special experience in connection with the purchase of securities from Chinese companies. Nor did the times of purchase here span a two-year period during which new information became available about the nature of the shares that are at issue. Nor is there any evidence about what new information relevant to the knowledge defense became available during the six-week class period. Indeed, almost all of the evidence submitted as to knowledge concerns disclosures prior to the commencement of the class period. For these reasons, there is no showing of the likely need for individualized assessments of class members with respect to the knowledge defense. The facts in this case do not parallel those in *New Jersey Carpenters Health Fund.*

*Fourth,* the loss causation defense invites a reformation of the class definition, which will address the commonality issue. Thus, the central basis for Defendants' argument on this defense is that certain purchasers or CDM stock may have sold it at a profit or without a loss, prior to the suspension of the trading in CDM shares. However, as Plaintiffs' counsel conceded at the hearing, the class will not include those purchasers who fit into this category. It will only include those who purchased CDM shares and suffered a loss.

*Finally,* Defendants suggest that combining the Section 12 claims (Second Cause of Action) of those who purchased from Gunnar and the Section 11 claims of those who purchased shares through the IPO or in the aftermarket (First, Third and Fourth Causes of Action) will necessarily lead to a proceeding in which common issues will not predominate. This issue is addressed by the Court's finding that the moving parties have not shown sufficient numerosity with respect to such Section 12 claims. Defendants' more general claim that there is insufficient commonality between the claims of those who purchased in the IPO and those who purchased in the aftermarket, is unpersuasive. The class definition limits class members to those who purchased at either time, and who allegedly were injured by the claimed misrepresentation and omissions in the prospectus and registration statement issued in connection with the IPO. Accordingly, common issues will predominate, especially in the setting of this action in which the class period covers only six weeks. Thus, there has been no showing that those who purchased later in the period were in a different position than those who purchased earlier with respect to injury.

### b) Superiority of Class Proceeding

All of the factors relevant to the superiority inquiry support a class proceeding. Thus, the interests of the class members will be protected and served, there is no pending litigation that will be adversely affected by a class proceeding here, proceedings in this District are appropriate and no difficulties are likely to be encountered in managing the class action. Fed.R.Civ.P. 23(b)(3). Moreover, a class proceeding, rather than what could be hundreds or even thousands of individual actions, will be far more efficient and will thereby reduce litigation costs and promote greater efficiency. Counsel and class

representatives have adequate experience and commitment to protect the interests of the class members.

### E. Conclusion

The following class is certified, but only with respect to the First, Third and Fourth Causes of Action in the SAC:

All persons or entities that purchased or otherwise acquired China Century Dragon Media, Inc. ("CDM" or the "Company") common stock in the Company's public offering (the "Offering") on February 7, 2011 or purchased or otherwise acquired CDM stock in the aftermarket pursuant and/or traceable to the Company's registration statement and public offering prospectus issued in connection with the Offering during the period from February 7, 2011 through March 21, 2011 (the "Class Period"). Excluded from the Class are Defendants, the present and former officers and directors of CDM and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, those who purchased shares from Joseph Gunnar & Co., LLC, and those who purchased and sold shares during the Class Period who did not incur any loss.

### V. *Disposition*

For the foregoing reasons, the Motion to Dismiss the Cross–Claim for Indemnity is granted with prejudice, the Motion to Dismiss the Cross–Claim for Contribution is granted without prejudice, and the Motion for Class Certification is granted in part and denied in part.

**IT IS SO ORDERED.**